Supreme Court—Garber v. Board of Health of City of Paterson.

ISAAC GARBER, RELATOR, v. THE BOARD OF HEALTH OF
THE CITY OF PATERSON ET AL., RESPONDENTS.

Argued October 8, 1925—Decided January 21, 1926.

Municipalities—Licenses—Chicken    Abattoir—Permit    Granted
Upon Condition That Premises be Put in Conformity to Plans
of Health Director—Such Plans Were Conformed to—Li-
cense Afterward Denied and a New Ordinance Preventing
the Licensing of Abattoirs so Situated Adopted—Held, That
Conditional Permit Constituted a License When Conditions
Were Fulfilled, That the New Ordinance Cannot Affect This
Transaction, and that Mandamus to Compel Actual Issu-
ance of License be Issued.

On rule to show cause for a peremptory *mandamus*.

Before Justices PARKER, MINTURN and BLACK.

For the relator, *Mendelsohn & Mendelsohn.*

For the respondents, *Benjamin J. Spitz, David G. Smith*
and *J. Vincent Barnitt.*

PER CURIAM.

The relator desires a writ of peremptory *mandamus* re-
quiring the board of health of the city of Paterson to issue
to him a license for the operation of what is known as a
chicken abattoir at a designated location in said city. The
application was vigorously opposed, and the matter has re-
ceived very earnest and careful consideration.

Normally, and concededly in this case, the issuing of such
a license, in the first instance, would be discretionary with
the board of health, and, if it were deemed discretionary at
this juncture, we should, of course, be obliged to discharge
the rule. The fundamental facts, however, shining through
a very considerable smoke cloud raised by the testimony,
lead us, without any hesitation, to the conclusion that the

license was, in effect, granted, and that, on the strength of it, the relator incurred some $7,500 of expense in transforming the premises from an ordinary dwelling or similar building so as to make them adaptable for the specialized use to be made under the license. In doing this he was obliged to rip out partitions and waterproof floors and walls and make other extensive and expensive alterations under the direction of the board of health and its officials over a period of several months, and after he had completed these alterations, and at the end of that time had satisfied the conditions with relation to the granting of the license, it was refused him by a vote of four to three, although originally granted unanimously.

The original move of relator toward this license was taken in the summer of 1924. Application was made in due form to the board of health, and, as required by the regulations, the application was advertised. At the meeting of September 10th, 1924, the application came up for action and was unanimously approved. One of the difficulties about a proper examination of the case and ascertainment of the facts has been the fact that, although full and copious minutes of all the proceedings of the board seem to have been kept, those minutes were never put in evidence as documents, and the entries therein have had to be gathered up by picking them out of the columinous printed case at various points. On September 10th the motion was made as follows:

"I move you, Mr. President, that this board grant permit for chicken abattoir, provided, however, that the building is constructed in conformity with the plans as submitted to the health director. This permit is not to be granted until the building is finished, seconded by Commissioner Callahan, and carried unanimously."

This we consider to have been a definite grant of the license, subject merely to the condition subsequent that the relator should put the premises in such condition as to satisfy the regulations of the board of health relating to chicken abattoirs. It is quite obvious that this was the

natural and normal thing to do under the circumstances, for, naturally, no one would take the risk of going to the expense of many thousands of dollars to adapt his premises for those purposes without any assurance from the board of health that the license would be had after it was done. So far, therefore, as this resolution goes, it seems to have settled the matter, but at this point commences a series of countermoves, apparently, on the part of opposed business interests looking towards the end of preventing the relator from obtaining his license. We say "opposed business interests," because neither the board of health nor the city of Paterson is represented by its own counsel on this argument, nor was either represented at the taking of the depositions by counsel. Such counsel as have appeared have been acting manifestly in the interest of private parties who objected to the application for reasons best known to themselves, and those counsel went on the record as stating that the apposition to the license was conducted by them, not only without any expense to the city of Paterson, but that they guaranteed to indemnify and save harmless the city and the board of health as against all costs in the matter.

At the very end of this meeting of September 10th, and as relator testified, without his knowledge or suspicion, and some time after the resolution in question had been unanimously passed, a petition seems to have been presented by someone, the contents of which, so far as we can discover, were not spread upon the record of the case as of that date, but, as a result of this, another resolution was introduced, reading as follows:

"Inasmuch as the petitioner, whose name heads this petition, is in the abattoir business, I move you, Mr. President, the issuance of a permit to Mr. Garber to conduct an abattoir be laid over until the October meeting."

There is nothing to show that Garber had any knowledge of this resolution, or that he was there; there is nothing to show that any notice of it was directed to be given to him, and not only is there nothing to show that any notice of it reached him, but there is positive evidence on his part that

he knew nothing about it, and that during that month, and, indeed, until the November meeting was imminent, he was prosecuting his alterations and improvements with vigor and spending large sums of money thereon.   No notice was, in fact, given.   The October meeting came and relator was not present, nor was his counsel, as they say, and with reason, because neither of them knew anything about it.   The matter of the Garber license came up, and the minutes show a long entry, too long to copy here, reciting that counsel was present representing the signers of a petition objecting to the license, and two or three individuals, who were neighbors, made objections personally.   It was stated, among other things, that there were enough chicken abattoirs already in that neighborhood, and that they were not agreeable neighbors.   The entry then proceeds: "Commissioner Callahan felt that the board should hold up the matter for another month, in that Mr. Mendelsohn, representing Mr. Garber, is not present, and, therefore, the board cannot hear the applicant's argument.

"By Commissioner Mitchell—I move you, Mr. President, that this matter be laid over for one month.   Commissioner Callahan offered an amendment to the motion, which was accepted, as follows: That the secretary be instructed to notify the principals in this case to appear at the next meeting of the board; seconded by Commissioner Murn, and carried unanimously."

It is somewhat significant, also, that at this meeting the board finally passed, or finally approved, a supplemental ordinance prohibiting any chicken abattoir at any place "not heretofore licensed, unless the applicants show that it is not within fifty feet of any building used wholly or in part as a dwelling."   The passage of this ordinance was invoked on the argument on this rule as a reason for denying the writ.

The relator went on with his repairs and improvements, all under the inspection of a health officer, obtaining from time to time the necessary certificates that the work was properly done and according to regulations, and by about

November 4th had completed them. One of two minor matters of detail were urged as showing that he had not complied with the conditions laid upon him, but we deem them insignificant and immaterial. In every substantial way the requirements of the board and of its officers have been carried out. He appeared at the meeting armed with his certificates and ready to take and pay for his license. There is some evidence in the case to the effect that four members of the board had been closeted in a private room for some time before the meeting, and that they were the same four who afterwards voted to refuse the license. This is a circumstance, but we do not particularly rely upon it. What is clear is that at that November meeting it appears on the minutes that the question of issuing the permit came up, and the health officer was asked whether the building was constructed in conformity with the ordinance regarding checken abattoirs, and the health officer answered in the affirmative. The introduction of the minutes of this meeting seems to have been vigorously resisted by the respondents at the time of taking the depositions, and, consequently, the depositions are not very full on that point, but the secretary of the board of health then read the following motion and resolution:

"By Commissioner Mitchell—I move you, Mr. President, that the permit be not granted; seconded by Commissioner DeLuccia. A roll call proved the following: Ayes, Commissioners Cotton, DeLuccia, Hayes and Mitchell; nays, Commissioners Callahan, Murn and president of the board. The secretary announced the vote, and the president declared the motion carried.

The permit was, accordingly, refused.

It is argued that *mandamus* is not a proper remedy in this case, and that the relator should have invoked the writ of *certiorari*. To this we cannot agree. As was stated at the outset, the issuance or refusal of permits in cases like this, where the matter is intrusted to the judgment of a municipal body, is normally a matter of discretion, and it may be assumed that, in the first instance, it was a matter

of discretion in the present case.    But the matter had passed the stage of discretion; that discretion had been exercised in favor of granting the permit, and the applicant was notified of that fact and told that the permit was ready for issue upon his compliance with the regulations of the board of health with respect to the structure and arrangement of the building.    Having complied with those regulations, the natural, proper and legal step was to issue the permit to him.    This was a legal duty devolving upon the board of health in view of its own action.

It is also suggested that the original resolution of September 10th was reconsidered by the later resolution at the same meeting and revoked.    We find no such action indicated.    On the contrary, we find that the board attempted to lay it over to a subsequent meeting after telling the relator that the license was conditionally granted, and did nothing with it until he had completed his building, at which time the board undertook to nullify its action.    Such nullification, in our view, was nugatory, because the board had effectively estopped itself from any change in the situation except such as might be justified by the failure of the relator to carry out the condition imposed upon him.

Nor is there any material question of fact in dispute. On the facts as we have stated them, and we think they are incontrovertible, the relator was entitled to his license on payment of the fee.    As to the ordinance of October 8th, that does not change the situation, for it was an *ex post facto* ordinance, and not controlling on him or on the board with reference to his license.    *Reimer* v. *Dallas,* 3 *N. J. Adv. R.* 1302.

The relator is entitled to a peremptory writ of *mandamus,* pursuant to the language of the rule to show cause, which will be made absolute.